**WELLS FARGO BANK, N.A., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 51–88C.

United States Court of Federal Claims.

April 11, 1995.

Daniel Joseph, with whom were Miriam Samuel, Akin, Gump, Strauss, Hauer & Feld, and David C. Tobin, Tobin & O'Connor, Washington, DC, for plaintiff.

James M. Kinsella, Washington, DC, with whom were David M. Cohen, Director, Commercial Litigation Branch, and Frank W. Hunger, Asst. Atty. Gen., Civ. Div., U.S. Dept. of Justice, for defendant. Robert E.

Lusk, Washington, DC, U.S. Dept. of Agr., was of counsel.

### *OPINION*

SMITH, Chief Judge.

This case comes before the court to determine damages for breach of contract. The court has previously found liability against the Farmers Home Administration (FmHA) for breaching its contract with Wells Fargo Bank to issue a loan note guarantee pursuant to the government's ethanol loan guarantee program. *Wells Fargo Bank, N.A. v. United States*, 26 Cl.Ct. 805 (1992). The government's ethanol loan guarantee program sought to achieve various policy goals, including the development of alternative, renewable energy sources, the creation of an enlarged grain market, and the promotion of increased employment in rural areas. The highly uncertain economic viability of ethanol caused private lenders to deny loans for the construction of ethanol plants. Accordingly, the ethanol loan guarantee program was designed to provide incentives to lending institutions by guaranteeing 90% of the financing needed to construct ethanol plants. In this case, the program succeeded in inducing Wells' to finance the construction of an ethanol plant. The company constructing the ethanol plant was High Plains Corporation.

The contract breached in this case was a unilateral contract that consisted of documents entitled "Conditional Commitment for Guarantee" and "Intercreditor Agreement." These documents contained conditions to be met by Wells in return for the FmHA's issuance of the guarantee. The existence of these documents induced Wells to perform by lending High Plains the necessary funds to construct an ethanol plant. The plant was constructed and was operating, apparently profitably, at the time of the trial. In this court's previous opinion on liability the court found that a valid contract existed and that the FmHA breached its obligation to issue the guarantee.

Trial on damages presented the court with the unique task of determining what the absence of a guarantee cost the plaintiff, even though the loan never defaulted. The

basic issues presented were whether Wells suffered any damage because of the breach, whether the damages claimed were foreseeable by FmHA, and whether the damages claimed have been quantified to a reasonable degree of certainty. For the reasons stated in this opinion the court awards Wells Fargo damages in the amount of $10,885,423.86.

### *FACTS*

#### A. The Banking Industry.

The liability, or non-asset, side of a bank's balance sheet primarily consists of deposits and equity. Deposits comprise a large liability item on a bank's balance sheet, and come in a variety of forms. A significant portion of a bank's deposits are insured by the federal government, and it is deposits that banks use to conduct their lending business. A bank's lending activity is accomplished by leveraging its capital. The amount of capital determines how much lending a bank can do. For example, if a bank is operating at a 5% capital to asset ratio, it can hold 20 dollars of assets (i.e., loans to customers) for every dollar of capital invested by its shareholders. Banks do not lend out their capital, but instead use their capital to support a highly leveraged liability structure. Therefore, when a bank has a dollar of capital it can go out and raise deposits from the public, both insured and uninsured. It is by managing this liability structure, or "sources of funding" as banks call it, that a bank can build its balance sheet, and build its asset base. *See* Tran. 399. Wells' highly credible expert, Nevins D. Baxter, testified that typically 50–85% of a bank's assets are loans, with the remainder constituting risk-free government securities or cash. This is true in part because national banks are generally prohibited from owning stock, except when acquired as part of a loan restructuring. Accordingly, the asset side of a bank's balance sheet consists mostly of loans, with comparatively few assets derived from fee generating businesses.

The banking industry is highly regulated. Mr. Baxter testified that the focus of the federal regulators' attention is on capital levels and asset quality. The "legal lending

limit" regulates the amount a bank can loan relative to its capital. Tran. 391. Bank examiners rate banks on a scale of 1 to 5; 1 denotes a healthy bank and 5 denotes a bank that has gone out of business. Larger banks typically have resident regulators that monitor their capital levels and asset quality year round. Banks also have internal procedures that monitor asset quality. When these procedures are sound, and followed, the regulators have more confidence in the objectivity of the bank's internal system. This leads to less scrutiny, and less over the shoulder regulation. Most important these procedures are in the best interest of depositors, stockholders, and consistent with sound banking practices.

Banks are required to maintain certain minimum capital to asset ratios. However, regulators insist, and bank management certainly wants, a capital to asset ratio higher than the regulatory minimum. Regulators are not comfortable having banks approach the regulatory minimum, and bank management wants to present the bank to the marketplace as a safe institution. Accordingly, the regulatory minimum is in actuality a danger level. If a bank is even close to the regulatory minimum there is usually a problem. When a bank gets in trouble it begins to liquidate its assets to avoid approaching the regulatory minimum. Baxter testified that Wells Fargo has historically been well above the regulatory minimum, but that Wells Fargo has been more heavily leveraged than other large banks. *See* Plaintiff's Exhibit 20x.

The quality of loans (the bank's principal assets) are also monitored by a rating system. Loans are classified on a 9–point scale; 1 signifies an excellent trouble-free loan, and 9 signifies a total loss. The majority of loans are actually somewhere on the continuum between 1 and 9, depending on the quality of collateral, the timeliness of payments, and the general risks associated with the borrower's business. For example, a loan rated as 5 or 6 may go on a "watch list" or "special mention list" which triggers certain internal policies and procedures the bank uses to work with the borrower to cure any deficien-

cies. If a loan is rated 7 or 8 it would probably be classified as "substandard" or "doubtful." As the classification reaches 7 or 8 the likelihood that bank regulators will require specific "loan loss reserves," or in the extreme case a partial or total "charge-off," dramatically increases.

A charge-off is the writing off of a portion of a loan believed to be no longer collectible. Charge-offs reflect the bank's and the regulator's view about the current value of the loan as an asset. A charge-off corresponds to a decrease in the bank's capital, and reduces the bank's income in the period taken. This capital loss prevents the bank from growing its business by leveraging the lost capital in accordance with its capital to asset ratio. In extreme cases charge-offs may even cause the bank to liquidate assets if its capital to asset ratio reaches a danger level.

The quality rating of a particular loan also affects the accounting treatment of payments received from the borrower. As a loan moves down the continuum from 1 to 9 it will eventually be classified as a non-performing loan for accounting purposes. Loans are classified as non-performing if there are serious or constant delinquencies by the debtor in scheduled payments, or if there is a substantial decrease in the value of collateral, regardless of whether the debtor is current on payments. The idea being that either of these events raise doubts about the ultimate collectibility of the loan. When a loan is non-performing regulators require the bank to use either "non-accrual" or "cash basis" accounting depending on the severity of risk. Accrual status means the bank is allowed to book interest payments as income when scheduled, whether or not they have been received from the borrower. Cash basis status means the bank is allowed to book interest payments as income only when they are received from the borrower. Non-accrual status means the bank is not allowed to book any payments as income until the bank balance of the loan is zero. That is, until the loan is being carried at zero value on the bank's books. Moreover, when a loan is on non-accrual status the bank is usually re-

quired to establish a reserve against it.[1] This rigid accounting system is a result of the regulators' concern that risky assets not be represented at unrealistic or inflated values.

There is a critical distinction in bank accounting between "bank balance" and "customer balance." Banks essentially have two sets of accounting books for any particular loan. The bank balance of a loan reflects the accounting treatment of the loan as an asset to the bank. The customer balance of a loan reflects the accounting treatment of the loan between the bank and the borrower, as reflected in the legal terms of the note.[2] Throughout the life of any loan the borrower is supposed to make payments of interest and principal as scheduled pursuant to the terms of the loan, and these payments are applied to reduce the customer balance. However, because the bank balance consists of only the principal amount of the loan, payments may affect the bank balance differently. Scheduled interest payments on a performing/accrual status loan are booked as income to the bank when scheduled—which increases the bank's capital, and only principal payments are applied to reduce the bank balance. This is the ideal situation for the bank because it can book interest as income at the earliest possible time. Increased capital enhances the bank's ability to expand its lending business, or pay dividends to its stockholders.

## B. Wells Fargo's Dealings with High Plains.

The ethanol plant construction loan from Wells to High Plains was supposed to be guaranteed by the federal government. However, the FmHA refused to issue the loan guarantee in December 1986, and Wells proceeded to work with High Plains over several years in an effort to get the plant operating and profitable with the goal of securing repayment of the monies owed. High Plains had a low liquidation value, and Wells Fargo believed it was in its best interest to work with High Plains to get and keep the company alive and in a position to service its now unguaranteed debt. However, soon after the guarantee was denied, national bank examiner Jens Jensen informed Wells Fargo that he believed the loan was a total loss and that Wells should charge-off the entire High Plains loan. *See* Tr. 120.

After FmHA denied Wells' administrative appeal in mid–1987—thus leaving no chance the guarantee would issue—Wells approached High Plains about restructuring its outstanding debt. In September 1987, Wells and High Plains agreed to restructure the $32,656,789.00 outstanding debt in a fashion similar to what would have occurred at the December 1986 guarantee closing. In essence, $12.7 million of the debt was converted to options to purchase 84% of High Plains' stock, and High Plains' loan balance was reduced to $20,000,000.00. The term of the loan was stated at ten years with a fixed interest rate of 12.23%. However, given the riskiness of the loan a much higher interest rate was justified, but 12.23% is the highest rate High Plains could service.

In 1988, a drought occurred which narrowed the spread between grain and ethanol prices. This was so because grain prices went up while ethanol, which sold in an unrelated market affected largely by oil prices, did not. This resulted in severe financial stress for High Plains. It was also during this period that Wells succumbed to increasing regulatory pressure and charged-off $9.7 million of the High Plains loan: $6.7 million on December 30, 1988, and $3 million on March 15, 1989.

By March 1989, it had been several months since High Plains made any principal or interest payments, and its efforts at a public stock offering to raise capital had been unsuccessful. Also, Wells was under continuous regulatory pressure to charge-off the remaining bank balance of the High Plains loan. In May 1989, a group of foreign investors was interested in purchasing High Plains, but they were unwilling to do so while

---

1. Although economic damage may also have occurred from "loan loss reserves" in this case, Wells Fargo is not claiming this as an element of damage.

2. Regulators are concerned with the bank balance accounting, while borrowers are generally concerned with the customer balance accounting.

Wells retained warrants entitling it to 84% of High Plains' stock. Accordingly, High Plains' management approached Wells about a second restructuring that would require Wells to relinquish the warrants, but as a precondition to considering a second restructuring, Wells required High Plains to turn over $548,000.00 in cash it had been holding.[3]

The parties finally agreed to a second restructuring in May 1989. Wells also agreed to relinquish the Warrants for $2.5 million in cash, and restate the loan at $20,903,526.25: $19,451,663.43 in principal and $1,451,862.82 in accrued interest. The term of the loan was converted to a 30–year amortization with a balloon payment due after five years, and the interest rate was fixed at 10%. Wells also obtained an agreement from High Plains that any excess cash not needed for immediate business purposes would be paid to Wells. All payments received by Wells were used to reduce the bank balance of the loan. The bank balance of the High Plains loan was reduced to zero by March 1990, but the customer balance remained at $20,210,000.00.

The second restructuring anticipated High Plains' ability to retire the Wells debt within five years through a public stock offering. In March 1993 this was accomplished, with a relatively small shortfall of $389,423.86. Wells agreed to waive the $389,423.86 shortfall in order to receive the $17,689,244.01 net proceeds of the sale. This all or nothing approach was made necessary by the rules governing security offerings.

## C. Damages Claimed by Wells.

### 1. Debtside Damages.

#### a. The Shortfall from the 1993 Public Offering.

In 1993, High Plains finally found itself in a position to conduct a public offering poten-tially capable of retiring the Wells Fargo debt. Wells and High Plains agreed to proceed with the offering only if it provided a minimum of $17.5 million. The customer balance on the High Plains loan was $18,078,-667.87 at the time. The net proceeds of the 1993 offering amounted to $17,689,244.01 (1.9 million shares at $10.25 per share—less the costs of the offering). Wells agreed to waive the shortfall of $389,423.86 if it received all the proceeds of the offering. If the loan guarantee from FmHA had issued, Wells argues, it would not have waived this remaining principal amount because it would have been covered by the guarantee.

#### b. Lost Capital Damages.

Because of the FmHA's breach, Wells was left with a risky unbankable loan as opposed to a relatively risk-free government guaranteed loan. Accordingly, federal banking regulators exerted pressure on Wells to reduce the bank balance of the High Plains loan as fast as possible. Because of this pressure Wells was forced to take charge-offs of $9.7 million on the bank balance of the High Plains loan. These charge-offs resulted in an equal reduction to Wells' capital. This capital reduction lessened the ability of Wells to make loans of up to 15 times the amount of the charge-offs—the approximate capital leverage ratio for the bank at the time. The lost income on these allegedly foregone loans was quantified by Wells' expert to be $6,849,-000.00, which was based on a 14% average rate of return on Wells' lending business for the preceding years.[4]

The second aspect of Wells' lost capital damages involves the method by which banks are permitted to account for risky loans. High-quality/low-risk loans are treated on an accrual basis; the bank can book interest payments from the borrower as income when they are scheduled under the terms of the

---

**3.** High Plains had no incentive to turn over these funds prior to this time because it was not enough to bring the High Plains loan current.

**4.** Wells also calculated a damage figure based on a hypothetical stock repurchase program using the $9.7 million in lost capital. See Plaintiff's Exhibit 20bb, 20cc, 20dd. Under this scenario, the damage figure was actually higher, approximately $12.254 million. Under either scenario, the basic premise underlying the lost capital

analysis is that banks use capital as profitably as possible. Banks set target floors for capital retention and attempt to employ all "excess" capital above this minimum, whether through loaning, stock repurchasing, dividends, etc. That is, if a bank finds itself with "excess" capital, it is unintended, and the bank is sure to quickly put it to profitable use. This premise was clearly supported at trial.

loan, regardless of when they are received. If a loan has some problems but its collectibility is ultimately assured (i.e., guaranteed by the United States) then the bank is usually allowed to book interest payments due under the loan as income when they are actually received from the borrower. This is called cash basis accounting. If the loan is risky and its ultimate collectibility is in doubt, the bank must usually treat the loan on a non-accrual basis. Because of the FmHA's breach in this case Wells was forced to treat the High Plains loan on a non-accrual basis, as opposed to a cash basis. As a result, Wells temporarily lost the ability to book interest payments received from High Plains as income; income that would have increased Wells' capital by the same amount. This loss was temporary because the High Plains loan eventually reached the "recovery phase" in March 1990, at which time all payments were booked as income. Just as with the charged-off capital, Wells argues this temporarily lost capital would have been put to a profitable use. Wells' expert calculated the lost earnings from loans this capital could have supported, and accounted for the recoupment that occurred during the recovery phase of the High Plains loan. These damages were quantified at $3,647,000.00, which essentially represent the time value of the lost earnings caused by the temporary loss of capital. In sum, the total debtside damages claimed by Wells is $10,885,423.86.

The government argues that an additional $5 million in financing would have been required as a condition precedent to the issuance of the guarantee, and that this would significantly affect Wells' lost capital damage calculation. The government's contention in this regard is questionable for several reasons. Wells persuasively argues in its post-trial brief that even if the $5 million was made available it would not have been used, and that under no circumstances would its lost capital damages be reduced by more than $1.025 million. The additional $5 million in short-term financing was actually a settlement offer by Wells which the government refused. Furthermore, it would have

been a unilateral change to the contract for the government to demand the additional financing in a backdoor attempt to reduce the size of its guarantee and shift part of the risk of loss to Wells. As it turned out, High Plains did not need the additional financing, and even if it was provided it would have been illogical to use it to pay long-term debt.

### 2. Equityside Damages.

After the FmHA breached its agreement to issue the loan note guarantee, Wells and High Plains restructured their loan in 1987. This restructuring was similar to one that was intended to occur within the context of the 1986 guarantee closing. The 1986 closing anticipated a debt-for-equity exchange to improve High Plains balance sheet.[5] At the time High Plains owed over $32 million to Wells Fargo. Wells agreed to exchange $12.7 million in debt (the amount over the original $20 million) for warrants on 84% of High Plains stock. If the guarantee had issued Wells was looking to the equity as a "store of value" to recover monies owed above the guaranteed amount. *See* Tran. 478–480.

By May 1989 High Plains was again in financial distress due in part to a drought in 1988. At this time Wells agreed to a second restructuring. In the May 1989 restructuring, Wells agreed to sell the equity back to High Plains for $2.5 million. Wells insists it sold the equity solely to reduce the bank balance on the High Plains loan because it was under pressure from federal regulators. This evidence is both logical and uncontradicted. If the guarantee had issued Wells argues it would have held onto the equity to maximize its value, and eventually would have sold it to recover unguaranteed funds owed by High Plains. Wells argues it would have sold 60% of the equity no earlier than March 1993 for $18,360,000.00, and retained the balance having an estimated value of $12,240,000.00. After making adjustments for discounts and the amount received from the actual sale of warrants in 1989, Wells' expert calculated the total adjusted loss on

---

**5.** The 1986 loan note guarantee closing anticipated Wells exchanging about $7 million in debt for equity, and forgiving outright about $5 million in

debt. This is the only apparent distinction from what actually occurred in 1987.

the equity as $26,264,000.00. As an alternative theory, Wells posits that if it had sold half the equity in the 1989 restructuring, and the remaining half in 1993, the total adjusted loss would be $18,277,000.00.

In sum, the total amount of damage claimed by Wells is $37,149,423.86 or $29,162,423.86, depending on which equityside figure is used.

## DISCUSSION

### A. General Principles.

█ In a case for breach of contract the goal of compensation is not the mere restoration to a former position, as in tort, but the awarding of a sum which is the equivalent of performance of the bargain. Stated differently, compensation is not ordinarily the value of the contract, but the value of its performance to plaintiff. 11 SAMUEL WILLISTON, A TREATISE ON THE LAW OF CONTRACTS §§ 1339 & 1343 (3d ed. 1968). Generally, the attempt is to place the plaintiff in the position he would be in if the contract had been fulfilled. CHARLES TILFORD MCCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 137 (1935); 11 WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 1338 (3d ed. 1968).

█ In awarding appropriate compensation the court must assess gains prevented as well as losses suffered which would not have occurred had the contract been performed. 11 WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 1338 (3d ed. 1968). As late as 1853, one who failed to carry out his contract was, so far as legal theory went, liable for any and all resulting loss sustained by the other party no matter how unforeseeable such loss may have been. MCCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 137 (1935).

█ However, in 1854 the English Court of Exchequer handed down an opinion in the landmark case of *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng.Rep. 145 (1854), which has furnished the general standard by which English-speaking courts test claims for breach of contract. The case was brought by the owner of a gristmill against a carrier for delay in delivering a shipment consisting of broken pieces of the gristmill shaft. The carrier was told that the mill was stopped, and that the shaft must be sent immediately, but he was not told that the stoppage of the mill was solely on account of the broken shaft, or that no other shaft was available. The plaintiff claimed damages for lost profits due to the idleness of the mill, and the jury allowed the claim. The court, however, stated:

> Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it.

MCCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 138 (1935) (citing *Hadley v. Baxendale* ).[6]

---

**6.** Although the main principle of *Hadley v. Baxendale* is to subject all contract claims to the test of foreseeability, it also highlights a distinction between "general" and "special" damages. Confusion sometimes results from the use of the term "consequential" to refer to harm suffered as a "consequence" of the breach of duty, but not as a *direct* or *immediate* or *foreseeable* consequence (each of the modifiers of "consequential" is, of course, a legal conclusion). It seems that "consequential damages" is a term that is used loosely as a synonym of "special" as opposed to "general" damages. The court agrees with Professor Corbin that "[t]he use of this expression should be abandoned," 5 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 1011 (1964), though it is probably too late in the day for this. If such damages are not recoverable it is for reasons of economic logic or for failure of proof. Damages are held to be recoverable if they flow *naturally* or *ordinarily* from the breach of contract itself. Such damages are supposed to have been in the contemplation of both parties as the probable, obvious, or even presumptive result of the breach. However, damages that have occurred because of the specific breach, but do not always immediately result from that type of breach, are more difficult to recover. In order to recover these damages the plaintiff must show that defendant had reason to know of specific circumstances related to the injury that existed at the time of entering the contract. MCCORMICK, HANDBOOK ON THE LAW OF DAMAGES §§ 138 & 140 (1935);

■ The court in *Hadley* held that the notice given was not sufficient to apprise the carrier that the delay would cause the mill to remain idle. McCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 138 (1935). Because unlimited liability had previously been the legal standard for contract breach, the main significance of the case lies not in the dictum that if notice is given liability will attach. Rather, the history making influence of the case lies in the decision that liability will not attach for damage which was not "in the contemplation" of the parties "at the time they made the contract." McCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 138 (1935). The standard is objective and takes account of what the defendant, who made the contract, might then have reasonably anticipated, in light of the facts known to him, and does not confine the inquiry to what he actually did anticipate. McCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 138 (1935) (citing *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 23 S.Ct. 754, 47 L.Ed. 1171 (1902)); 5 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 1009 (1964). The principle of *Hadley v. Baxendale* has been universally accepted, and there has been little variation of the original phraseology in the use of the principle by American courts, whose opinions still repeat the formula that damages are limited to the "natural and probable consequences" and those which in the light of the facts of which they had knowledge, were "in the contemplation" of the parties. McCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 138 (1935) (citing cases).[7] Note, however, the rationale applied by Judge Posner in *Evra v. Swiss Bank Corp.*, 673 F.2d 951 (7th Cir. 1982), and *Rardin v. T & D Machine Handling, Inc.*, 890 F.2d 24 (7th Cir.1989).

■ Under federal law the principle of *Hadley* is stated somewhat differently. In *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 23 S.Ct. 754, 47 L.Ed. 1171 (1903), Justice Holmes found that a breaching party can only be found liable for damages if it can be fairly "presumed [the defendant] would have assented [to] if they had been presented to his mind." *Globe Refining Co.*, 190 U.S. at 543, 23 S.Ct. at 755; *see also Prudential Insurance Co. v. United States*, 801 F.2d 1295, 1300 (Fed.Cir.1986); *Rocky Mountain Construction Co. v. United States*, 218 Ct.Cl. 665, 1978 WL 8468 (1978); *Northern Helex Co. v. United States*, 524 F.2d 707, 714–15, 207 Ct.Cl. 862 (1975); *Ramsey v. United States*, 101 F.Supp. 353, 121 Ct.Cl. 426, 433 (1952); *Myerle v. United States*, 33 Ct.Cl. 1, 1800 WL 2024 (1897). That is, the extent of liability "depends on what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made." *Globe Refining Co.*, 190 U.S. at 544, 23 S.Ct. at 755–56.[8]

---

5 CORBIN, CORBIN ON CONTRACTS § 1011 (1964); 11 WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 1344A (3d ed. 1968).

7. This "foreseeability" or "contemplation" doctrine is the only substantial test for the legal requirement as to "proximate" causation. 5 CORBIN, CORBIN ON CONTRACTS § 1007 (1964). With respect to *losses* suffered by a plaintiff the question of foreseeability of the injury is often determined with the aid of hindsight. However, the problem is different in the case of gains that have been prevented by the defendant's breach of contract. These "profits" have not occurred, and the court must determine whether or not they would have occurred if there had been no breach. The problem with lost profits involves the making of an often very complex prediction. 5 CORBIN, CORBIN ON CONTRACTS § 1007 (1964). *See also Finley v. United States*, 31 Fed.Cl. 704 (1994) (plaintiff's claim for lost profits denied as being too "speculative"). What would have been the sequence of events if the defendant had not breached, when in fact it did?

8. It should be noted, however, that this particular phrasing of the *Hadley v. Baxendale* rule has not been universally accepted. McCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 141 n. 56 & n. 57 (1935); 5 CORBIN, CORBIN ON CONTRACTS § 1008 n. 4 (1964); 11 WILLISTON, A TREATISE ON THE LAW OF CONTRACTS §§ 1356 n. 8 & 1357 n. 4 (3d ed. 1968). In particular, Professor Williston criticizes the language used in *Globe Refining Co.* as follows:

> To assert ... that the measure of damages for breach of a contract is based on the terms of the contract is to assert a fiction which obscures the truth and invites misapprehension which may lead to error. [citing *Globe Refining Co.*] One who, on borrowing money, agrees to pay it the following month does not stipulate for the alternative right to keep the money at legal interest until the lender can get judgment and levy execution, although this is the only remedy the law can enforce.... Parties generally have their minds addressed to the performance of contracts—not to their breach or the consequences which will follow

The formulas of notice and contemplation, and what courts attempt to do when applying them, can best be described as follows:

The formula is one for use in determining whether the *interest* involved is protected by the agreement. And it is not a contemplation of *consequences* from a possible breach, but a contemplation of *interests* which may be protected by the contract. Parties, in making contracts, rarely contemplate *the losses* which would result from its breach. But they do count the advantage they will gain from its performance. *What interests does the contract promote or serve?* These are actually considered in most part, and those which are shown to have been considered or reasonably falling within the terms in view of the language used and the background of the transaction, mark its boundaries—the limits of protection under it.

McCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 141 n. 60 (1935) (quoting GREEN, RATIONALE OF PROXIMATE CAUSE 51 (1927) (emphasis in original)).

 The "certainty" rule is an additional standard requiring a reasonable degree of persuasiveness in the proof of the amount as well as the fact of damage. McCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 26 (1935); *see also* 11 WILLISTON, A TREATISE ON THE LAW OF CONTRACTS §§ 1345–1347 (3d ed. 1968); 5 CORBIN, CORBIN ON CONTRACTS §§ 1020–1028 (1964) In traditional phraseology, the "certainty" requirement is usually accompanied by the statement that the damages must not be "contingent," "conjectural," or "remote." McCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 25 (1935). These terms are not classifications of damages, but instead characterize a situation where the evidence fails to prove to a reasonable degree of certainty what would have occurred if the defendant had not breached the contract. In short, the damages must be capable of ascertainment by reference to some definite standard, either of market value, established experience, or direct inference from known circumstances. McCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 26 n. 11 (1935).

 Although courts uphold the standard of certainty as an ideal, the following modifications of the rule have developed to avoid harsh applications:

 (a) If the fact of damage is proved with certainty, the extent or amount may be left to reasonable inference.

 (b) Where the defendant's wrong has caused the difficulty of proof of damage, he cannot complain of the resulting uncertainty.

 (c) Mere difficulty in ascertaining the amount of damage is not fatal.

 (d) Mathematical precision in fixing the exact amount is not required.

 (e) If the best evidence of the damage of which the situation admits is furnished, this is sufficient.

McCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 27 (1935) (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931)); *see also Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1327 (Fed.Cir.1987); *Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1065 (Fed.Cir.1983); *Locke v. United States*, 283 F.2d 521, 151 Ct.Cl. 262, 267 (1960).

 Loss of commercial profits remains the usual field for the application of the standard of certainty. McCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 28 (1935); *see Also Goolsby v. United States*, 21 Cl.Ct. 88 (1990); *Jackson v. United States*, 12 Cl. Ct. 363 (1987). In proving a claim for loss of profits of an established business, the record of past profits is usually the best available evidence. McCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 29 (1935); 11 WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 1346A (3d ed. 1968); 5 CORBIN, CORBIN ON CONTRACTS § 1023 (1964). These profits are not necessarily too uncertain of realization for recovery as damages, even though they are dependent on the uncertain conduct of

---

a breach. *The fiction here criticized is a manifestation of the broader fiction that parties contract for whatever obligations or consequences the law may impose upon them.*

11 WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 1357 (3d ed. 1968) (emphasis added).

customers and of competitors. If the business is one that is established, a reasonable prediction can often be made as to its future on the basis of its past history. 5 CORBIN, CORBIN ON CONTRACTS § 1023 (1964); *see also McDermott v. Middle East Carpet Co., Asso.*, 811 F.2d 1422, 1428 (11th Cir.1987) ("Where ... a claimant can show a 'track record' of profitability, evidence can be considered and lost profits can be awarded"). Moreover, when concrete data of past profits is furnished an expert witness having special experience in the field may interpret the data by giving an expert opinion as to the probable profits that would have been made. McCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 29 (1935).

## B. Wells' Damages.

■ The government's initial argument is that if any damages are recoverable they must be limited by the terms of the guarantee. In the court's view this argument misses the crux of the plaintiff's case. The guarantee contract is not the contract that was breached in this case; it was never entered into. Here the breached contract was the government's promise to issue the guarantee if Wells satisfied the conditions in the Commitment Letter and Intercreditor Agreement. The amount of the guarantee would be a limitation on damages only if the guarantee had been issued, Wells called the guarantee, and some dispute arose concerning how much the government must pay. Under the government's theory there would never be any consequence for breach when it wrongfully chose not to issue a guarantee. That is, it would have been indifferent *ex ante* regarding its decision to issue the guarantee or breach; either way its maximum exposure is 90% of principle plus 100% of interest. Here the government's promise was to issue the guarantee, and it is this initial contract that was breached. Accordingly, this is the focus of the court's inquiry, and the government's argument that damages must be limited to the terms of the guarantee misconstrues the nature of the contract and the breach at issue.

At bottom this case is about risk shifting. The government promised Wells it would not have to bear the significant risks associated with providing a construction loan for an ethanol plant. The sole purpose of FmHA's ethanol loan guarantee program was to induce banks to provide financing for ethanol producing concerns when they otherwise would not do so. The reason they would not is because good banking practices would not allow the risks associated with ethanol plant loans. This was the reason for the government's guarantee policy which served to achieve a public policy goal that the market would not otherwise engage in. To put it another way, it was a method of the public subsidizing the creation of an ethanol industry at a hopefully lower cost than directly giving the money to ethanol producers.

The banking industry is highly regulated by the federal government, due in part to federal deposit insurance. Federal bank regulators severely restrict the ability of banks to engage in risky lending with depositor money. This in turn leads prudent banks to be extremely cautious in their lending activities. The consequences for banks of risky lending can be extreme even if the downside risk never materializes, and the potential upside for risk taking is strictly limited. Because of the nature of the banking industry and its regulatory environment, banks with risky assets suffer immediate consequences. In short, banks are not venture capitalists, but instead make money by managing highly regulated and comparatively risk-free liability structures. The federal government actively strives to maintain this conservative lending environment in order to insure the stability of the banking system.

However, there are occasions where this conservative lending environment impedes what the government believes are socially desirable activities—such as the production of alternative fuel sources. Accordingly, if the government wishes to promote risky, but otherwise socially desirable lending activity, it must bring the risks associated with such loans in line with the conservative banking system it has created. One way the government does this is by counterbalancing lending risk with a government guarantee. This was the essence of the bargain in this case.

Given the regulated nature of the banking industry, the value of the government guarantee promised in this case goes beyond the mere promise of payment in the event of default by High Plains. A guarantee is essentially an insurance policy, and insurance policies have value even if the risk insured against never materializes. However, the question the court faces here is whether any damage was suffered because of the government's failure to issue the "insurance policy" it promised after the plaintiff had performed the conduct sought. For example, if a life insurance company breaches a contract to issue a life insurance policy to an individual, there may be no financial consequences provided the individual does not die during the term of insurance. This is the analogy the government wants the court to make in this case. Even assuming arguendo it breached the contract, the government argues Wells has suffered no financial loss because it recouped more dollars than it lent out on this particular transaction with High Plains. However, these are not the facts of this case.

The government's analogy does not fit when the "insured" is a federally regulated commercial bank. The analogy would be complete if, for example, the individual who was wrongfully refused a life insurance policy was required by law to freeze a portion of his assets—to pay liabilities—in an effort to hedge against the risk of "uninsured" death, or was forbidden from engaging in certain kinds of employment without life insurance. This is precisely how the banking system operates. Bank regulators require banks to deal with risk *ex ante*, regardless of whether or not the risk ever materializes. Banks prefer to do this by collateralizing loans or receiving third party guarantees. However, when these methods are not available bank regulators require banks to deal with risks by taking charge-offs, making loan loss reserves, or altering the accounting treatment of risky loans. By breaching its promise to issue the guarantee in this case, the government shifted the risk associated with the High Plains loan to Wells, and Wells was required to deal immediately with that risk through the use of charge-offs and special accounting. Accordingly, the damages claimed in this case spring directly from the risk the government wrongfully thrust upon Wells.

In the court's view there is no doubt that Wells has suffered substantial economic consequences due to the government's breach. However, the more difficult issue is whether *all* the damages claimed by Wells were foreseeable at the time of contracting, and have been quantified to a reasonable degree of certainty. The court concludes that Wells has satisfied the contract law standards of foreseeability and certainty with regards to the debtside damages, but not as to the equityside damages.

### 1. Debtside Damages.

The debtside damages claimed by Wells essentially fall into two analytical categories: (1) the $389,423.86 shortfall from the 1993 public offering, and (2) the lost capital damages.

#### a. The Shortfall from the 1993 Public Offering.

The government does not dispute the $389,423.86 claimed by Wells on foreseeability or certainty grounds. The only argument the government raises as to this part of the debtside damages is that it represents interest upon interest which is prohibited by regulation. 7 C.F.R. § 1980.11. This argument essentially boils down to an issue of accounting on the customer balance of the High Plains loan.

The FmHA guarantee would have covered 90% of principal and 100% of interest on the original $20 million loan.[9] The government says that because the 1987 and 1989 restructurings involved the recapitalization of interest exceeding $389,423.86, this element of damage constitutes prohibited interest on interest. However, the court agrees with Wells' position that the $389,423.86 repre-

---

**9.** Before the government's breach Wells charged-off the $2 million portion of the original $20 million loan that would *not* have been covered by the guarantee, and Wells is not asking for damages as a result of this particular charge-off.

Accordingly, the principal on the bank balance of the original $20 million loan as of December 1986 was $18 million, all of which would have been covered by the guarantee.

sents the remaining *principal* owed on the customer balance after the 1993 public offering.

Banks routinely apply payments from borrowers to interest first, and principal second, on the customer balance of loans. In this case the "bank" and "customer" balances looked different in 1993. On the bank balance all payments were being booked as interest income because the loan had essentially been written off and was in the recovery phase. However, the customer balance—the legally enforceable balance—was not affected by the bank balance accounting so that the remaining $389,423.86 represented *principal* that would have been covered by the guarantee.

The government's argument challenges how Wells applied the payments it received from High Plains on the customer balance. It essentially argues the payments received from High Plains should have been used to reduce principal on the customer balance; thus the remaining $389,423.86 would constitute interest upon interest. However, there was no evidence presented at trial that this would have been appropriate or consistent with industry or regulatory accounting standards. Accordingly, the court is unwilling to accept the recharacterization of payments urged by the government, and will award Wells the $389,423.86 claimed.

### b. Lost Capital Damages.

■ The second analytical category of the debtside damages claimed by Wells is more complex; the lost profits resulting from the capital losses caused by the government's breach. The government's effort to contest the methodology used by Wells' expert to quantify Wells' claim is specious. The government argues that "average rates of return" are too speculative because they do not account for the possibility that the foregone loan opportunities may have been uncollectible. The government is simply wrong in this regard. Averages by definition account for the entire range of possibilities based on the bank's prior history. Here, Wells' used an average rate of return of 14% based on its actual historical experience, *see* Plaintiff's Exhibit 20i, and the government does not challenge the accuracy of Wells' figures in this regard.

The court also rejects the government's argument that 28 U.S.C. § 2516(a) or *Wickham Contracting Co., Inc. v. Fischer*, 12 F.3d 1574 (Fed.Cir.1994), bar Wells' lost profits claim. Section 2516(a) was not intended to single out lending institutions by barring their claims for lost profits because their profits take the form of interest on loans. Nor is Wells, contrary to the facts in *Wickham*, asking for an average rate of return on its lost capital. Banks do not lend out their capital. Rather, banks lend out deposits in accordance with their capital to asset ratio; the more capital, the more deposits the bank is permitted to lend. It is the interest on these foregone loans—which resulted from the lost capital—that Wells is seeking to recover.

■ Equally absurd is the government's argument that no damage occurred because Wells has not specifically identified customers that were turned down for loans because of the government's breach. Not only would such a requirement be asking Wells to prove a negative, but it is not the proper framework for the court's inquiry. The question before the court is not whether Wells has proven it could not make particular loans because of the government's breach, but whether Wells could have made more loans but for the government's breach. For example, if Wells was in the business of selling widgets, and the government's breach caused part of its business to shut down for a year, Wells certainly would be entitled to recover profits on lost widget sales *without having to identify every customer who did not buy a widget from Wells because of the government's breach.* Based on Wells' business history, the testimony of its corporate officers, and Wells' expert testimony, the court finds that Wells has provided the best evidence available to quantify the profits it lost because of the government's breach. MCCORMICK, HANDBOOK ON THE LAW OF DAMAGES §§ 27 & 29 (1935) (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931)); *see also Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320,

1327 (Fed.Cir.1987); *Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir.1983); *Locke v. United States*, 283 F.2d 521, 151 Ct.Cl. 262, 267 (1960). The government does not seriously challenge the bulk of the economic or statistical methodology used by Wells' expert. *See* Plaintiff's Exhibits 20*l*, 20m, 20n, 20p, 20ff. Accordingly, the main issue before the court with regards to whether or not the lost capital damages are recoverable is whether they were foreseeable at the time of contracting.[10] Specifically, Wells is claiming that the charge-offs, and its inability to book interest as income when received, resulted in $10,496,000.00 in lost profits from its diminished lending capacity.

The court finds that Wells has met the standard of the *Hadley v. Baxendale* rule on foreseeability of lost profits. *John–Manville Corp. v. United States*, 13 Cl.Ct. 72, 161–62 (1987), *vacated on other grounds*, 855 F.2d 1571 (Fed.Cir.1988); *see also Prudential Insurance Co. v. United States*, 801 F.2d 1295, 1300 (Fed.Cir.1986); *Rocky Mountain Construction Co. v. United States*, 218 Ct.Cl. 665, 1978 WL 8468 (1978); *Northern Helex Co. v. United States*, 524 F.2d 707, 714–15, 207 Ct.Cl. 862 (1975); *Ramsey v. United States*, 101 F.Supp. 353, 121 Ct.Cl. 426, 433 (1952); *Myerle v. United States*, 33 Ct.Cl. 1, 1800 WL 2024 (1897).[11] The sole purpose of the FmHA program was to alleviate the very type of risk of loss that occurred in this case. The effect of the charge-offs and the loan's non-accrual status (i.e., inability to book interest as income when received) were clearly foreseeable in this case due to the nature of the FmHA's loan guarantee program, and the regulated nature of the banking industry. The government's argument to the contrary is not credible. It is not disputed that the individuals involved on both sides of this transaction were seasoned and sophisticated bankers. Moreover, these damages are not dependent on the success or failure of High Plains as a going concern. Without a guarantee on the High Plains loan, capital losses were automatic regardless of High Plains payment history. From the outset, the threat of capital losses—and their ramifications—hung over this transaction like the sword of Damocles. This is precisely why Wells sought the FmHA Guarantee, and precisely why FmHA was in the business of issuing such guarantees. In short, the court holds that the lost capital damages claimed by Wells were foreseeable at the time of contracting, and that there was no intervening causal step between the government's breach and the damages claimed by Wells.

Wells' lost capital analysis does require the court to make one logical inference: that banks employ capital as profitably as possible. Banks are in the business of leveraging their capital, in this case at ratios of 15 to 1. Accordingly, banks do not intentionally let capital remain idle above a minimum "cushion" amount set by the bank's board to assure compliance with regulatory minimum capital levels.[12] The government argues that the lost capital in this case fell within the cushion, and would not have been used. The

---

**10.** It is unnecessary to the court's analysis or conclusions in this case to express an opinion on the case law cited by plaintiff indicating that the time of breach controls the foreseeability determination. *See e.g., Gardner Displays Co. v. United States*, 171 Ct.Cl. 497, 505 (1965).

**11.** The court does not accept defendant's interpretation of the case law that lost profits from unrelated business transactions are never recoverable against the federal government. Rather, the court interprets the case law cited by the government—cases in which lost profits from unrelated business transactions were denied—to have been decided on foreseeability grounds. *But see Prudential Insurance Co. v. United States*, 801 F.2d 1295, 1302–03 (Fed.Cir.1986) (Nichols, J., concurring) ("The inadequacy of 'foreseeability' alone to distinguish allowable from unallowable items of cost or loss, is plain. Even though antecedently considered, injury to the other party is not only 'possible,' but even 'probable,' in case of a breach it may not be allowable.... [It is naive to treat] the ostensible test of 'foreseeability' as the real one.")

It is also questionable as to whether, in this case, the foregone loans were "unrelated business transactions."

**12.** The amount of cushion capital a bank has depends on the particular bank involved, but in most cases the amount of capital a bank allows to remain idle is well above the regulatory minimum. However, the evidence presented at trial showed that Wells' was a more aggressive lender than other banks of similar size (i.e., that Wells maintained less of a capital cushion than other banks in its peer group). *See* Plaintiff's Exhibit 20x.

government cites the lack of any internal contemporaneous memos from Wells indicating that it was capitally constrained, or had insufficient capital to conduct its business. The government argues that Wells had plenty of capital to do its business and did not need, nor would have used, the capital it lost because of the government's breach. The court finds the government's argument is flawed in two respects.

First, the lack of contemporaneous evidence that Wells was capitally constrained refutes rather than supports the government's argument that the lost capital claimed here would have remained idle "cushion" capital. Rather, the lack of contemporaneous evidence that Wells was capitally constrained supports Wells assertion that this lost capital was not "cushion" capital, and would have been employed as profitably as possible. Second, the issue is not whether Wells would have expended resources to raise additional capital to conduct more business, but whether Wells could and would have profitably employed the capital it already contracted for and lost due to the government's breach. When viewed from this perspective, there is no doubt Wells would have put the lost capital claimed here to a profitable use. Moreover, the court fails to see the relevance in the government's broader argument that Wells made "enough" money on this transaction, or was not "stoped in its tracks" because of the government's breach. A breach that causes a profitable contract to be less so is just as compensable as a breach that causes a negative cash flow or total loss. To rule otherwise would impose a means test on the "victims" of contract breach. While Wells' first dollar in profit may be more important to it than its millionth, it does not follow that the government is not liable for preventing gains Wells otherwise would have reaped but for the government's breach. Accordingly, the court will award Wells $10,-496,000.00 in lost capital damages. The combination of this amount with the $389,423.86 award for the shortfall discussed above results in a total award of $10,885,423.86 in debtside damages.

## 2. Equityside Damages.

■ In 1987 Wells acquired warrants for stock as part of the first restructuring of the High Plains loan. As part of the second restructuring in May 1989, Wells agreed to sell the equity back to High Plains for $2.5 million. Wells insists it sold the equity solely to reduce the "bank balance" on the High Plains loan because it was under pressure from federal regulators. However, the government argues Wells probably thought the stock was "worthless" at the time, and that given the future prospects of the company $2.5 million in hand was better than the uncertain future value of the stock. *See* Defendant's Exhibit 33. Wells asserts it was still looking to the equity as a "store of value" even though the equity was actually acquired post-breach as part of the September 1987 restructuring. *See* Plaintiff's Brief at 9 (quoting transcript). Wells argues that if the government had issued the guarantee it would have sold 60% of the equity no earlier than March 1993 for $18,360,000.00, and retained the rest having an estimated value of $12,240,000.00. Wells' expert calculated the total adjusted loss on the equity as $26,264,000.00. As an alternative theory, Wells posits that if it had sold half the equity in the 1989 restructuring, and the remaining half in 1993, the total adjusted loss would be $18,277,000.00.[13]

Unlike the debtside damages, the court finds that the damages claimed here do not meet the standards of foreseeability and certainty. Most importantly, Wells has failed to establish that the value of the equity was an *interest* protected by the contract. While the FmHA might have foreseen that Wells was going to acquire an equity interest in High Plains, it does not follow that the FmHA could have foreseen that the denial of a loan guarantee would cause a loss to debt turned into equity which was never intended to be guaranteed. Wells alleges that it went ahead with the equity acquisition in 1987 still believing the equity represented a store of value to recover sums over $20 million despite knowing the government had breached its agreement to issue the guarantee. The likelihood that Wells might have to sacrifice

---

**13.** The stock values used by Wells' expert are based on the actual 1993 public offering.

the equity at a low price to reduce the bank balance was known when it acquired the equity; the very crux of plaintiff's case is that pressure from regulators to reduce the bank balance was foreseeable from the moment of the government's breach. In sum, the court concludes that the risk of High Plains' stock value was always on Wells' account.

Moreover, even if the government did not breach, High Plains stock value would have been unpredictable. The amount of these damages, unlike the debtside damages, is totally dependent on the success or failure of High Plains as a going concern under a hypothetical scenario where the guarantee had been issued. If the guarantee had been issued, it is possible—if not likely—that Wells would have called the guarantee within the first two years. In this situation the debt and equity would have been held by two separate entities. Wells would have held the equity, and the FmHA would have held the debt. This scenario creates completely different dynamics from what actually occurred. With an additional player—the FmHA—the ability of High Plains to even stay in business, no less achieve the 1993 stock price, is questionable. The point here is that the stock value actually achieved in 1993 is not necessarily probative on what, if any, value High Plains stock may have had under the guarantee scenario.

Even the experts disagree as to exactly how Wells would have disposed of the stock if the guarantee had issued. Wells' own expert gives two alternative possibilities, both of which seem equally plausible: (1) that Wells would have sold 60% of the equity in 1989 and 40% in 1993; or (2) that Wells would have held all the equity until 1993 at which time it would have sold part of the equity. *See* Plaintiff's Exhibits 20q, 20r. The reason both seem plausible is that Wells probably had mixed motivations in selling the equity for $2.5 million. These two alternatives produce a swing in the damage calculation of approximately $8 million. Stated simply, the court would be conjecturing if it granted an award based on what Wells might have done, with equity of uncertain value, under a completely hypothetical situation.

While this, no doubt, has the effect of understating Wells' actual loss, this result is mandated by our law's requirement of a relatively high degree of certainty in light of the very limited human ability to predict the future. Accordingly, the court is unable to award Wells' any damages based on the equity it held in High Plains.

This result maybe somewhat harsh since it is arguable that but for the government's breach Wells would not have been under any regulatory pressure to reduce the bank balance any faster than the customer balance. Thus, the primary goal of Wells would have been to use the stock to at least recover the $12.7 million in loans (over the guarantee) that had been converted into stock warrants. If this case was a tort action, a case might well be made for awarding Wells the difference between the $2.5 million it recovered and the $12.7 million cost basis of the stock warrants. However, judges are not allowed to craft awards that they believe are just and fair. Rather, they are bound by legal rules to decide what the law commands. To do otherwise would be to violate the judges' oath. So, while to truly make Wells whole might require an additional $10 million equityside award, the law that this court must apply does not allow such a remedy in this case. As the late Senior Circuit Judge Philip Nichols, Jr. noted in *Prudential Insurance Co. of America v. United States,* 801 F.2d 1295 (Fed.Cir.1986):

> The inadequacy of damages in case of government contract breach has become anomalous in contrast to the generosity with which damages are today awarded in other contexts. While damages are supposed or imagined to provide a disincentive to violating the legal rights of others, the government here may even enjoy incentives to commit such violation in some circumstances, when equitable relief and tort liability are both unavailable. I am not advocating judicial lawmaking, however. The matter would appear to call for congressional attention as it involves the waiver of sovereign immunity.

801 F.2d at 1303 (Nichols, J., Concurring).

### CONCLUSION

Contract law exists to ensure that non-breaching parties receive the benefit of their

bargains. In this case the government bargained for the creation and maintenance of an ethanol plant to promote its alternative energy source policy. The ethanol facility created by High Plains and Wells Fargo was built and is still in operation. In other words, the government received the benefit of its bargain. Wells Fargo, on the other hand, bargained for a bankable asset free from the risk of charges to the bank's capital. Wells did not receive this. Instead, Wells Fargo, like Charlie Brown, had the government's enticing guarantee "pulled away" at the last minute. Accordingly, Wells was left with an unbankable loan, that through its own efforts it was able to almost completely recover. However, these efforts were not without cost. Because of the government's breach Wells Fargo incurred the costs of dealing with a problem loan detailed in this opinion. Wells Fargo deserves compensation for these costs in order to receive the benefit of its bargain. Accordingly, the court concludes that Wells has suffered damages due to the government's breach of its promise to issue the loan note guarantee, and the court will award Wells damages in the amount of $10,885,423.86.

IT IS SO ORDERED.