FRIEDMAN, Senior Circuit Judge.
 

 This appeal and cross appeal challenge decisions of the United States Court of Federal Claims that (1) held that the Farmers Home Administration (the Administration) of the Department of Agriculture breached an agreement with the plaintiff/cross-appellant, Wells Fargo Bank, N.A (Wells Fargo), to guarantee the bank’s loan,
 
 Wells Fargo Bank, N.A. v. United States,
 
 26 Cl.Ct. 805 (1992), and (2) awarded Wells Fargo $10,885,423.86 in damages.
 
 Wells Fargo Bank, N.A v. United States,
 
 33 Fed.Cl. 233 (1995). We affirm the determination of breach, part of the damages, and the denial of Wells Fargo’s claim for additional damages, but reverse the major portion of the damages award.
 

 I.
 

 A In 1972 legislation, Congress authorized the Administration to
 

 make and insure loans to public, private, or cooperative organizations ... for the purpose of improving, developing, or financing business, industry, and employment and improving the economic and environmental climate in rural communities____ Such loans, when originated, held, and serviced by other lenders, may be guaranteed by the Secretary [of Agriculture]----
 

 Rural Development Act of 1972, Pub.L. No. 92-419, § 118, 86 Stat. 657, 663 (current version at 7 U.S.C. § 1932(a) (1994)),
 
 reprinted in
 
 1972 U.S.C.C AN. 756, 763.
 

 The Administration’s regulations providing procedures for applying for loans and guarantees and determining such applications state:
 

 The purpose of the [business and industrial loan] program is to improve, develop, or finance business, industry, and employment and improve the economic and environmental climate in rural communities, including pollution abatement and control. This purpose is achieved through bolstering the existing private credit structure through guarantee of quality loans which will provide lasting community benefits. It is not intended that the guarantee authority be used for marginal or substandard loans or to “bail out” lenders having such loans.
 

 7 C.F.R. § 1980.401(b) (1982). “Inability to obtain credit elsewhere is not a requirement for guaranteed assistance under [the business and industrial loan program].”
 
 Id.
 
 § 1980.425(a). An Administration official
 
 *863
 
 testified at trial, however, that “the purpose of the lender program is to get banks to make loans that they ordinarily wouldn’t make. They are high risk loans.”
 

 Upon receipt of a request for a loan guarantee, the Administration evaluates the application and determines whether it may guarantee the loan. “If [the Administration] is able to guarantee the loan, it will provide the Lender and the applicant with Form FmHA 449-14 [Conditional Commitment for Guarantee], listing all requirements for such guarantees.” 7 C.F.R. § 1980.452 (1982). This form contains the Administration’s “advice to the lender that the material it has submitted is approved subject to the completion of all conditions and requirements set forth in ‘Conditional Commitment for Guarantee.’”
 
 Id.
 
 § 1980.6(a)(4). The lender and applicant can review the conditions and requirements in the Conditional Commitment and decide whether to accept them, reject them, or propose alternate conditions.
 
 Id.
 
 § 1980.458.
 

 Administration regulations state that once all requirements have been met, the Administration and the lender “will execute” both a lender’s agreement detailing the lender’s responsibilities and the loan note guarantee itself.
 
 Id.
 
 § 1980.61,1980.6(a)(13). The regulations define “loan note guarantee” as “[t]he signed commitment issued by [the Administration] setting forth (specifically or by reference) the terms and conditions of the guarantee.”
 
 Id.
 
 § 1980.6(a)(14). The maximum loss covered “can never exceed ... 90 percent of the principal and interest indebtedness.”
 
 Id.
 
 § 1980.20.
 

 The regulations also provide the procedures when the Administration refuses to issue a loan note guarantee:
 

 If [the Administration] determines that it cannot execute the Loan Note Guarantee because all requirements have not been met, it will promptly inform the lender on Form FmHA 449-13, “Denial Letter” of the reasons, and give the lender a reasonable period within which to satisfy [Administration] objections. If the lender writes [the Administration] within the period allowed requesting additional time to satisfy the objections, [the Administration] may, in writing, grant such additional time as it considers necessary and reasonable under the circumstances. If the lender satisfies the objections within the time allowed, the guarantee will be issued.
 

 Id.
 
 § 1980.61(d).
 

 B. In the Biomass Energy and Alcohol Fuels Act of 1980, Pub.L. No. 96-294, tit. II, 94 Stat. 611, 683-712 (codified as amended in scattered sections of 7 & 42 U.S.C.), Congress found that “the dependence of the United States on imported petroleum and natural gas must be reduced by all economically and environmentally feasible means, including the use of biomass energy resources.”
 
 Id.
 
 § 202(1), 94 Stat. at 683. Congress authorized loan guarantees for the construction of biomass energy projects, 42 U.S.C. § 8814 (1994), which include the production of ethanol,
 
 see
 
 42 U.S.C. § 8812(a) (1994). That legislation requires that “the applicant for such loan ... establish[ ] ... that the lender is not willing without such a guarantee to extend credit to the applicant at reasonable rates and terms.” 42 U.S.C. §.8814(g)(1).
 

 The Senate Committee Report on the act stated that
 

 [t]he loan guarantees ... would spur farmers, farm cooperatives and industry to construct alternative energy production projects. Bankers and businessmen, who frequently are reluctant to invest in new endeavors and usually take a “wait and see” attitude would witness, first hand, the feasibility and great potential of these government assisted projects. Once government makes this commitment, bankers and businessmen will have the confidence to proceed with similar alternative energy projects using private capital and ingenuity.
 

 S. Rep. No. 387, 96th Cong., 2d Sess. 48 (1980),
 
 reprinted in
 
 1980 U.S.C.CA.N. 1751, 1798.
 

 The Administration promulgated regulations for the new program in October 1980. Biomass Energy and Alcohol Fuels Loans and Loan Guarantees, 45 Fed.Reg. 72,044 (1980). In July 1983, the Administration repealed those regulations, because:
 

 
 *864
 
 (1) No projects have been funded under the [Biomass Energy and Alcohol Fuels] program since its inception---- The provisions of the Act and subsequent regulations were not as attractive to applicants as the [Administration] Business and Industry (B & I) guaranteed loan program regulations.
 

 (2) Applicants who were pursuing alcohol fuel projects were more interested in the B & I regulations provisions; therefore, the Administration processed and funded such applications (15 originally) under those regulations.
 

 (3) No subsequent appropriations have been provided since the original appropriation for the Energy Act and it is unlikely Congress will provide funding for separate [Biomass Energy and Alcohol Fuels] projects. Current Congressional appropriation actions are recommending that alcohol fuel projects be financed under the current B & I regulations rather than under the original Energy Act.
 

 Guaranteed Loan Programs, 48 Fed.Reg. 30,-941, 30,941 (1983).
 

 C. In the present case, the borrower, American Gasohol Refiners (American), in 1982 sought a $20,000,000 loan from Mid-Kansas Federal Savings and Loan Association (Mid-Kansas) to build an ethanol manufacturing plant in rural Kansas. Ethanol is an alcohol which may be blended with gasoline for use as fuel. Its price fluctuates depending upon changes in the prices of corn and other grains (from which it is made) and of oil.
 
 See Worldwide: Wall St Roundup HIGH PLAINS CORP. (HIPC),
 
 Wall Street Transcript, Mar. 21, 1994;
 
 Research Analyst Interview: BASIC BRANDED FOOD PRODUCTS,
 
 Wall Street Transcript, Aug. 8, 1994;
 
 Broker Report: ARCHER DANIELS MIDLAND (ADM),
 
 Wall Street Transcript, Sept. 12,1994.
 

 Mid-Kansas and American applied to the Administration for a guarantee of the loan. In the application, Mid-Kansas stated that it
 

 is pleased to sponsor and recommend this loan guaranty request to the [Administration]. We believe that this application and project are well planned, financially sound and properly suited for an [Administration] loan guarantee.
 

 Mid-Kansas sought a guarantee of ninety percent of the loan.
 

 In October 1982, the Administration issued a Conditional Commitment to Mid-Kansas and American, containing various conditions and stating that “[a] Loan Note Guarantee will not be issued until the Lender certifies that it has no knowledge of any adverse change, financial or otherwise, in the Borrower, his business, or any parent, subsidiaries, or affiliates since it requested a Loan Note Guarantee.” The Conditional Commitment also stated that “[w]hen these conditions and requirements are met, Farmers Home Administration will issue a loan note guarantee in the amount of ninety percent.”
 

 In December 1982, Wells Fargo agreed to finance American’s construction of the proposed ethanol plant. Subsequently, the Conditional Commitment to Mid-Kansas and American (which changed its name to High Plains,
 
 see Wells Fargo Bank, NA,
 
 26 Cl.Ct. at 807 n. 2), which would have expired in 1983, was extended. The ethanol plant was built and began production in 1984, but “Wells Fargo and High Plains determined that an additional $3.5 million was necessary to bring the plant to full production.”
 
 Id.
 
 at 807 (footnote omitted).
 

 Wells Fargo, High Plains, the Administration, and several other interested parties executed an Intercreditor Agreement, dated September 9, 1985, “which addressed the terms and conditions under which additional financing would be advanced by Wells Fargo.”
 
 Id.
 
 The Intercreditor Agreement extended the Conditional Commitment through June 1986, and stated that “[d]ue primarily to difficulties in achieving adequate production levels at the Plant, the [Administration] Guarantee has not issued.” The Agreement also reaffirmed that “upon compliance with the conditions of the Commitment and [Administration] regulations, the [Administration] will issue the [Administration] Guarantee for the benefit of Mid-Kansas or if Wells Fargo [become]s the lead lender, for the benefit of Wells Fargo.” A new Conditional Commitment naming Wells Fargo as the lead lender was executed in October 1986.
 

 
 *865
 
 In April 1986, the Administration directed its state directors to notify “lenders holding a conditional commitment for an alcohol production facility” of ten items that it intended to consider “in order to assure there is no adverse change in the project prior to their closing of the loan.” The items included “[e]urrent and future demand and markets for the product of the facility” and “[cjurrent and future prices of the product of the facility.” Wells Fargo objected to this directive, stating that the consideration of price and other macro-economic factors in the decision whether to issue a guarantee was contrary to the policy goals of the loan guarantee program and to the understanding of the parties at the outset of the process.
 

 In October 1986, the Administration wrote Wells Fargo that “we do not believe, based on the information submitted to date, that High Plains Corporation or Wells Fargo have met all conditions precedent to our issuance of the loan note guarantee.” The letter stated fifteen respects in which High Plains and Wells Fargo’s fulfillment of the conditions was deficient. Wells Fargo immediately responded, answering the fifteen deficiencies and explaining how each of the conditions had been satisfied. Additional correspondence ensued, both between Wells Fargo and the Administration and within the Administration, some of which indicated that the Administration was satisfied with the bank’s response and intended to issue the guarantee. Based on these discussions, Wells Fargo agreed to provide an additional $5,000,000 in financing for the project.
 

 In a December 19, 1986, letter from the Administration’s state director to Wells Fargo, however, the Administration stated that it was “unable to execute a Loan Note Guarantee.” The Administration explained that it was refusing to execute the guarantee because “[t]here has been an adverse change in the financial condition of High Plains Corporation during the period of time between the issuance of the Conditional Commitment for Guarantee in 1982 and December 17, 1986.” It referred to a Peat Marwick Mitchell and Company (Peat Marwick) report that “indi-eate[d] that based on the price of ethanol ($.80 per gallon) and the cost of milo [grain] ($1.23 per bushel), the company would not generate sufficient cash flow to meet its obligations as of October 1986, or in the foreseeable future.” The Administration also asserted that “[t]he history of the management of the corporation reveals numerous decisions which have caused adverse results and. led us to have serious concerns about the credibility of its management.”
 

 D. After the Administration refused to issue the loan guarantee, High Plains and Wells Fargo twice restructured the loan. As part of the first restructuring, Wells Fargo received options to purchase eighty-four percent of High Plains’s stock and reduced the loan balance by $12,700,000. In the second restructuring, Wells Fargo surrendered the options in exchange for $2,500,000 in cash.
 

 Following a public offering of its stock in 1993, High Plains paid its indebtedness to Wells Fargo with the exception of $389,423, which the bank forgave in exchange for receiving the proceeds of the public offering.
 

 E. After the Administration denied an administrative appeal of the refusal to issue the guarantee, Wells Fargo filed a breach of contract suit in the United States Claims Court (the name of which in 1992 was changed to the United States Court of Federal Claims. For convenience’s sake, we refer to the trial court by the latter name.)
 

 In its opinion on liability, the court granted Wells Fargo’s motion for partial summary judgment, holding that the Administration had contracted to issue the guarantee and had breached the contract.
 
 Wells Fargo Bank, NA,
 
 26 Cl.Ct. at 805 (1992). The court ruled that both the 1982 Conditional Commitment and the later Intercreditor Agreement were valid “conditional contracts.”
 
 Wells Fargo Bank, N.A,
 
 26 Cl.Ct. at 810. According to the court, the Conditional Commitment was a unilateral contract, under which the Administration’s commitment to issue the guarantee became binding when the bank began performance by making the loan to American.
 
 Id.
 
 at 810-11. The court stated that “ ‘[t]here is ample case law holding that a contractual relationship arises between the government and a private party if promissory words of the former induce significant action by the latter in reli-
 
 *866
 
 anee thereon.’ ”
 
 Id.
 
 at 810 (quoting
 
 National Rural Utils. Coop. Fin. Carp. v. United States,
 
 14 Cl.Ct. 130, 137 (1988),
 
 aff'd,
 
 867 F.2d 1393 (Fed.Cir.1989)). In the court’s view, both the Conditional Commitment and the Interereditor Agreement “constitute contracts that bind the [Administration] to issue the guarantee if the conditions were satisfied. The [Administration] was not free to withdraw its offer or to refuse to determine if the conditions were, in fact satisfied.”
 
 Wells Fargo Bank, N.A.,
 
 26 Cl.Ct. at 811.
 

 The court concluded that all of the conditions had been satisfied.
 
 Id.
 
 at 817. It rejected the Administration’s claims that adverse changes had occurred in either the financial condition or management of High Plains. The court ruled that the “first reason for denying the guarantee, insufficient cash flow due to low ethanol prices,” was “legally insufficient” because it was “based on conditions outside plaintiffs control for which the plaintiff did not assume the risk of forfeiture.”
 
 Id.
 
 at 815. The court also rejected the Administration’s concerns about adverse changes in company management, because many of the examples the Administration gave pre-dated the Intercreditor Agreement and “did not prevent the [Administration] from signing [it],”
 
 id.
 
 at 816, and also were known “prior to [the Administration] indicating informally that the guarantee would be issued.”
 
 Id.
 
 at 817.
 

 Following a separate trial on damages, the court awarded Wells Fargo $10,885,423.86.
 
 Wells Fargo Bank, N.A.,
 
 33 Fed.Cl. at 236. This amount comprised two elements. The major portion — $10,496,000—was for profits Wells Fargo allegedly lost because it was unable to make additional loans following a capital restructuring required as a result of the government’s refusal to issue the guarantee.
 
 See infra
 
 part III.A. The second item was the $389,423 that Wells Fargo forgave when it received the proceeds of High Plains’s public stock sale.
 
 Wells Fargo Bank, N.A.,
 
 33 Fed.Cl. at 245-46. The court, however, denied Wells Fargo’s additional request for damages of up to $26,264,000, reflecting its alleged losses from the surrender of its equity interest in High Plains, because those losses did not “meet the standards of foreseeability and certainty.”
 
 Id.
 
 at 248.
 

 II.
 

 The government challenges the rulings of the Court of Federal Claims (1) that there was a valid contract between the Administration and Wells Fargo that obligated the government to issue the guarantee upon Wells Fargo’s compliance with the conditions, and (2) that the Administration breached the contract when it refused to issue the guarantee because Wells Fargo had not satisfied the conditions.
 

 A. The Court of Federal Claims correctly ruled that the Conditional Commitment constituted a unilateral contract by which the government agreed to guarantee the loan upon Wells Fargo’s performance of the conditions specified, and that Wells Fargo accepted the contract through beginning performance by making the loan. As that court pointed out, ‘“a contractual relationship arises between the government and a private party if promissory words of the former induce significant action by the latter in reliance thereon.’ ”
 
 Wells Fargo Bank,
 
 N.A, 26 Cl.Ct. at 810 (quoting
 
 National Rural Utils. Coop. Fin. Corp.,
 
 14 Cl.Ct. at 137). Here, following the issuance of the Conditional Commitment, in which the Administration “agree[d] ... [to] execute” the “Loan Note Guarantee” (see
 
 infra),
 
 Wells Fargo accepted the government’s offer by making the $20,000,000 loan to finance construction of the ethanol plant.
 

 The government, however, argues that no contract was formed because “[u]nder [Administration] regulations, no Government official, not even one having authority to sign the guarantee at the proper time, had the authority to bind the United States to a loan note guarantee prior to compliance with all the regulatory requirements for issuance of a loan note guarantee.” As the Court of Federal Claims correctly stated, however, “the issue at this point is not whether these officials had the authority to grant a guarantee, but whether these officials had the authority to obligate the [Administration] to a Conditional Commitment.”
 
 Wells Fargo Bank, N.A.,
 
 26 Cl.Ct. at 810 n. 4. Administration
 
 *867
 
 officials were authorized to execute conditional commitments under the regulations implementing the business and industrial loan guarantee program.
 
 See
 
 7 C.F.R. § 1980.452 (1982). That the guarantee could not finally be executed until the conditions were fulfilled is irrelevant in determining the validity of the Conditional Commitment.
 

 Although Administration regulations characterize the Conditional Commitment as mere “advice” to the lender,
 
 id.
 
 § 1980.6(a)(4), the document itself shows that the government is making a binding promise:
 

 [T]he United States of America acting through the Farmers Home Administration (FmHA) hereby agrees that ... it will execute Form(s) FmHA 449-34 “Loan Note Guarantee” subject to the conditions and requirements specified in said regulations and below.
 

 Conditional commitments are signed by the Administration’s state director, the lender, and the borrower. The document lists twenty-nine separate conditions that must be satisfied before the Administration issues the loan guarantee. These include such costly endeavors as obtaining insurance, establishing an escrow account, paving a road, obtaining permits, and providing extensive documentation to the Administration. No lender and borrower would be willing to undertake such steps in reliance on mere “advice” rather than a firm promise. Moreover, in reliance on the Conditional Commitment, Wells Fargo risked the $20,000,000 it furnished to High Plains.
 

 That the government’s promise to issue the loan guarantee was contingent upon High Plains and Wells Fargo’s performance of numerous conditions does not make the promise any less binding. Indeed, the essence of a unilateral contract is that one party’s promise is conditional upon the other party’s performance of certain acts and when the other party performs, the first party is bound.
 
 See M.K Metals, Inc. v. Container Recovery Corp.,
 
 645 F.2d 583, 588 (8th Cir. 1981) (“ ‘(a) contract condition which qualifies a duty of performance by a party does not make the existence or validity of the contract hinge on the condition’ ”) (citation omitted);
 
 Moratzka v. United States (In re Matthie-son),
 
 63 B.R. 56, 60 (D.Minn.1986) (“[A] condition precedent is a condition precedent to performance under the contract, not formation of the contract. When a condition precedent is not satisfied, it relieves a party to the contract of the obligation to perform. It does not negate the existence of the contract or the binding contractual relationship of the parties.”). Although these cases did not involve unilateral contracts, they set out a general principle of contract law concerning conditional performance that is applicable to all types of contracts.
 

 Thus, the “preguarantee audit,”
 
 see
 
 7 C.F.R. § 1980.454 (Administrative B) (1982), which the government contends was a “ ‘further [necessary] act of the offeror,’ ”
 
 Cutler-Hammer, Inc. v. United States,
 
 194 Ct.Cl. 788, 441 F.2d 1179,1182 (1971) (citation omitted) that “negate(s) existence of a contract,”
 
 id.,
 
 does not alter the government’s commitment that once the conditions are satisfied, a loan guarantee will issue. The audit is only to ensure that all the conditions have been met, and “to assure that no adverse change has taken place,” 7 C.F.R. § 1980.454 (Administrative B).
 

 The government relies on and urges us to follow
 
 Runnemede Owners, Inc. v. Crest Mortgage Corp.,
 
 861 F.2d 1053 (7th Cir.1988), which it contends shows that it did not enter into a contract with Wells Fargo. That case involved a qualified commitment letter by a mortgage company relating to a projected loan to finance the purchase of a motel.
 
 Id.
 
 at 1054. The commitment was subject to the approval by the lender “in its sole discretion” of twenty specified items, including the income and expenses of the project.
 
 Id.
 
 at 1054,1057. After substantial discussions, the lender refused to make the loan because it concluded that the anticipated cash flow from the motel would be insufficient to support the loan.
 
 Id.
 
 at 1055.
 

 Applying Illinois law, the court of appeals affirmed the dismissal of the breach of contract claim. It described the commitment letter as “nothing more than an agreement to consider extending a loan, not an unqualified promise that such consideration would yield the financial help desired.”
 
 Id.
 
 at 1056. The
 
 *868
 
 court stated: “Because of Crest’s determination, under the clear terms of paragraph IV, no binding contract to extend the loan arose____ Runnemede’s interpretation runs contrary to the intent of the parties expressed in the conditional written commitment letter.”
 
 Id.
 
 at 1057.
 

 In the significantly different circumstances of the present case, in contrast, the Conditional Commitment created an obligation on the government to issue the guarantee if Wells Fargo made the loan and satisfied the other conditions. As the Court of Federal Claims correctly stated, this is an example of “ ‘a contractual relationship aris[ing] between the government and a private party [because] promissory words of the former induce[d] significant action by the latter in reliance thereon.’ ”
 
 Wells Fargo Bank, N.A.,
 
 26 Cl.Ct. at 810 (quoting
 
 National Rural Utils. Coop. Fin. Corp.,
 
 14 Cl.Ct. at 137). There is no provision in the Conditional Commitment comparable to the “in its sole discretion” language in
 
 Runnemede.
 
 To the contrary, the Conditional Commitment stated that, “when these conditions are met, [the Administration] will issue a loan note guarantee.”
 

 The fact that Mid-Kansas was the named lender in the 1982 Conditional Commitment and that Wells Fargo was not substituted as the lead lender until 1986 does not affect the binding nature of the 1982 commitment. The Administration was aware from the outset that Wells Fargo would provide the $20,000,000 financing for the ethanol facility. Furthermore, the 1986 Conditional Commitment that explicitly made Wells Fargo the lead lender stated that “[t]he Conditional Commitment for Guarantee and all items of conditions specified in the Conditional Commitment for Guarantee dated 10/1/82 and revised 12/15/82 continue in effect.” Thus, the 1982 Conditional Commitment was fully applicable to Wells Fargo.
 

 The 1985 Intercreditor Agreement, to which the Administration was a party, confirms that the earlier Conditional Commitment was a binding undertaking by the Administration to issue the guarantee upon Wells Fargo’s compliance with the conditions. The 1985 agreement, which covered the provision of additional financing for the ethanol plant by Wells Fargo, extended the Conditional Commitment through June 1986, stated that “[d]ue primarily to difficulties in achieving adequate production levels at the Plant, the [Administration] Guarantee has not issued,” and reaffirmed that “upon compliance with the conditions of the Commitment and [Administration] regulations, the [Administration] will issue the [Administration] Guarantee for the benefit of Mid-Kansas or if Wells Fargo [become]s the lead lender, for the benefit of Wells Fargo.”
 

 Indeed, at no time during the protracted discussions regarding the issuance of the guarantee did the Administration ever state, or even suggest, that the Conditional Commitment did not constitute a binding undertaking by it to issue the guarantee. Implicit in those discussions was the Administration’s recognition that it had made such a commitment and intended to carry it out. When the Administration finally refused to issue the guarantee, it relied not on the lack of a binding commitment to do so, but on changes in the borrower’s situation that it alleged constituted a failure to comply with the conditions upon which the commitment was based.
 

 B. The Conditional Commitment required that, before the Administration would issue the guarantee, “the Lender certiffy] that it has no knowledge of any adverse change, financial or otherwise, in the Borrower, his business, or any parent, subsidiaries, or affiliates since it requested a Loan Note Guarantee.” Wells Fargo provided this certification.
 

 The Administration nevertheless refused to issue the guarantee for two reasons: (1) “There has been an adverse change in the financial condition of High Plains Corporation during the period of time between the issuance of the Conditional Commitment for Guarantee in 1982 and December 17, 1986.” It relied on the Peat Marwick report that “based on the price of ethanol ($.80 per gallon) and the cost of milo ($1.23 per bushel), the company would not generate sufficient cash flow to meet its obligations as of October 1986, or in the foreseeable future.” (2) “The history of the management of the corporation reveals numerous decisions
 
 *869
 
 which have caused adverse results and led us to have serious concerns about the credibility of its management.”
 

 We agree with the Court of Federal Claims that neither reason justified the Administration’s refusal to issue the guarantee; and that since Wells Fargo had fulfilled all of the conditions of the Conditional Commitment, the Administration was required to issue the loan guarantee.
 
 Cf. Winstar Corp. v. United States,
 
 64 F.3d 1531, 1545 (Fed.Cir. 1995) (in banc) (“When the plaintiffs satisfied the conditions imposed on them by the contracts, the government’s contractual obligations became effective '....”),
 
 cert. grant
 
 ed; — U.S. —, 116 S.Ct. 806, 133 L.Ed.2d 753 (1996).
 

 High Plains’s alleged financial problems resulting from low ethanol prices and high grain prices were the very kinds of economic risks that were inherent in the ethanol manufacturing business. It was those risks that underlay the loan guarantee program. As an Administration official testified, “the purpose of the lender program is to get banks to make loans that they ordinarily wouldn’t make. They are high risk loans.”
 

 Whatever financial problem High Plains may have had as a result of these price fluctuations, it was not an “adverse change ... in the Borrower, [or] his business” within the meaning of the certification clause of the Conditional Commitment. That provision related to changes in High Plains’s own internal financial condition, not to changes in the markets in which High Plains operated and did business.
 

 The low price of ethanol and the high price of the grain from which it was made had not dissuaded the Administration in the latter part of 1986 from telling Wells Fargo that “[if] Wells Fargo provides [an additional $5,000,000 to High Plains], then [the Administration] is satisfied with the projected economics of this project.” The Peat Marwick report, on which the Administration relied, questioned High Plains’s continued viability only if there were no loan guarantee and no additional $5,000,000 financing. The report did not evaluate the company’s financial situation if Wells Fargo provided that additional financing, as it did.
 

 With regard to the company’s alleged management problems, the Administration had been aware of nearly all of them for a long time, and until the final decision letter, did not raise them as problems during the discussions about the company’s viability. Several of the items had occurred prior to the Intercreditor Agreement and the issuance of a new Conditional Commitment with Wells Fargo as the lead lender, apparently on the assumption that the loan guarantee process was proceeding as planned. Indeed, despite the supposedly significant management problems, shortly before the Administration’s refusal to issue the guarantee the Administration’s administrator wrote a member of the House of Representatives that the process was “culminating in the granting of the guarantee.” We agree with the Court of Federal Claims that “[t]he evidence offered by the [Administration] in the December 19th letter to support their allegation of poor management by High Plains does not support a finding that an adverse change had taken place.”
 
 Wells Fargo Bank, N.A.,
 
 26 Cl.Ct. at 816-17.
 

 III.
 

 “The general rule in common law breach of contract cases is to award damages that will place the injured party in as good a position as he or she would have been in had the breaching party fully performed.”
 
 Estate of Berg v. United States,
 
 231 Ct.Cl. 466, 687 F.2d 377, 379 (1982);
 
 Northern Helex Co. v. United States,
 
 207 Ct.Cl. 862, 524 F.2d 707, 713, 720 (1975),
 
 cert. denied,
 
 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976). However, “remote and consequential damages are not recoverable in a common-law suit for breach of contract ____ especially ... in suits against the United States for the recovery of common-law damages, such as the instant case.”
 
 Northern Helex Co.,
 
 524 F.2d at 720. Moreover, attempting to determine what would have happened if the guarantee had been issued necessarily involves a highly speculative and conjectural inquiry.
 

 The government challenges both items of damages the Court of Federal Claims awarded for the government’s breach of the eon-
 
 *870
 
 tract to issue the guarantee: (A) $10,496,000 for the profits the court determined Wells Fargo lost as a consequence of the breach and (B) $389,423 of High Plains’s indebtedness that Wells Fargo forgave when it received the proceeds of High Plains’s public stock offering. We reverse on the first item, and affirm on the second.
 

 A. 1. The Court of Federal Claims awarded lost profits damages on the following theory:
 

 A bank’s ability to make loans from the deposits it receives is limited by its capital. For each dollar of Wells Fargo’s capital, it could make loans of fifteen dollars. As a result of the Administration’s refusal to issue the guarantee and the poor quality of the High Plains loan, Wells Fargo charged off $9.7 million on the loan, which “resulted in an equal reduction to Wells’ capital. This capital reduction lessened the ability of Wells to make loans of up to 15 times the amount of the charge-offs — the approximate capital leverage ratio for the bank at the time. The lost income on these allegedly foregone loans was quantified by Wells’ expert to be $6,849,-000.00, which was based on a 14% average rate of return on Wells’ lending business for the preceding years.” WeZZs
 
 Fargo Bank, N.A,
 
 33 Fed.Cl. at 239.
 

 In addition, the risky character of the High Plains loan precluded Wells Fargo from treating interest payments it received on the loan as income. “[TJhat would have increased Wells’ capital by the same amount. This loss was temporary because the High Plains loan eventually reached the ‘recovery phase’ in March 1990, at which time all payments were booked as income. Just as with the charged-off capital, Wells argues this temporarily lost capital would have been put to a profitable use. Wells’ expert calculated the lost earnings from loans this capital could have supported, and accounted for the re-coupment that occurred during the recovery phase of the High Plains loan. These damages were quantified at $3,647,000.00, which essentially represent the time value of the lost earnings caused by the temporary loss of capital. In sum, the total debtside damages claimed by Wells is $10,885,423.86.”
 
 Id.
 
 at 240.
 

 The court held that Wells Fargo was entitled to recover “the lost profits resulting from the capital losses caused by the government’s breach.”
 
 Id.
 
 at 246. The court ruled that “[t]he effect of the charge-offs and the loan’s non-accrual status (i.e., inability to book interest as income when received) were clearly foreseeable in this ease due to the nature of the [Administration’s] loan guarantee program, and the regulated nature of the banking industry____[t]he lost capital damages claimed by Wells were foreseeable at the time of contracting, and ... there was no intervening causal step between the government’s breach and the damages claimed by Wells.”
 
 Id.
 
 at 247.
 

 2. Our predecessor court, the Court of Claims, in breach of contract cases repeatedly refused to award damages for profits lost on transactions not directly related to the contract that was breached.
 
 See Roberts v. United States,
 
 18 Cl.Ct. 351, 358 (1989) (citing Court of Claims eases denying lost profits damages). Of course, not every injury resulting from a breach of contract is remediable in damages.
 
 Globe Ref. Co. v. Landa Cotton Oil Co.,
 
 190 U.S. 540, 23 S.Ct. 754, 47 L.Ed. 1171 (1903).
 

 In
 
 Ramsey v. United States,
 
 121 Ct.Cl. 426, 101 F.Supp. 353 (1951),
 
 cert. denied,
 
 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952), where the government delayed payment on contracts with the plaintiff, the court, in denying lost profits damages, stated:
 

 The profits lost from the corporation’s over-all business activities, because of its shortage of capital allegedly occasioned by the Government’s failure to pay the contract amounts when due, may not be recovered either. It is important to bear in mind that the corporation’s claim is not for the anticipated profits of the contracts in question, but is a claim for the anticipated profits of its entire business enterprise. The lost profits of these collateral undertakings, which the corporation was unable to carry out, are too remote to be classified as a natural result of the Government’s delay in payment...-. “[T]here is a distinction by which all question[s] of this sort can be easily tested. If the profits are
 
 *871
 
 such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agree-ment____ But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.”
 

 Id.
 
 101 F.Supp. at 357-58 (quoting
 
 Myerle v. United States,
 
 33 Ct.Cl. 1, 26 (1897)).
 

 This reasoning is equally applicable to the present case. Here the Court of Federal Claims awarded damages for the profits Wells Fargo allegedly would have made on the additional loans it could have made if the guarantee had been issued. Like the lost profits in
 
 Ramsey,
 
 Wells Fargo’s loss of interest on additional loans it allegedly could have made had there been no breach is “too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.”
 

 In
 
 Olin Jones Sand Co. v. United States,
 
 225 Ct.Cl. 741 (1980), the Court of Claims refused to award damages to a company that, as a result of government wrongdoing, lost its bonding capacity and therefore was unable to obtain unrelated contracts.
 
 Id.
 
 at 743-44.
 
 See also Rocky Mountain Constr. Co.,
 
 218 Ct.Cl. 665, 666 (1978) (damages claim that had government not delayed contract performance, plaintiff would have profited from other contracts on which it would have bid, held legally insufficient);
 
 Northern Helex Co.,
 
 524 F.2d at 720-21 (“[Authorities support our denial of plaintiffs claim for the costs of the operation of its plant to the end of the contract term in connection with its nonfederal work with its related companies, because such costs are too remote, speculative, an[d] consequential to be compensable as damages.”);
 
 William Green Constr. Co. v. United States,
 
 201 Ct.Cl. 616, 477 F.2d 930, 936 (1973) (“[I]n a common law suit there would be no recovery for general loss of business, the claimed loss of the entire Green net worth, and losses on the non-federal work — such damages are all deemed too remote and consequential.”),
 
 cert. denied,
 
 417 U.S. 909, 94 S.Ct. 2606, 41 L.Ed.2d 213 (1974).
 

 The cases Wells Fargo cites are not to the contrary. In
 
 Neely v. United States,
 
 152 Ct.Cl. 137, 285 F.2d 438 (1961), lost profits damages were permitted when the government breached an agreement to lease land for mining.
 
 Id.
 
 285 F.2d at 442. There, however, the profits lost on the mine were caused directly by the breach and were proven with certainty. Unlike the present ease, the profits lost in
 
 Neely
 
 were profits on the use of the subject of the contract itself. Indeed, the only purpose of the contract in
 
 Neely
 
 and the other cases was for the plaintiff to make profits on the subject of the contract — through mining, dairy cow operations, or property resale.
 

 In the present case, in contrast, the purpose of the guarantee was to enable Wells Fargo to make profits from the interest on its loan to High Plains, not on some other loans it might make. The only portion of the damages the Court of Federal Claims awarded that directly resulted from the failure to issue the guarantee was the $389,423 of the indebtedness that Wells Fargo wrote off— the award of which, as explained in part III.B below, we uphold.
 

 In awarding lost profits damages, the Court of Federal Claims stated that “the main issue before the court with regards to whether or not the lost capital damages are recoverable is whether they were foreseeable at the time of contracting.”
 
 Wells Fargo Bank, N.A.,
 
 33 Fed.Cl. at 247. The court rejected the “defendant’s interpretation of the case law that lost profits from unrelated business transactions are never recoverable against the federal government. Rather, the court interprets the case law cited by the government — eases in which lost profits from unrelated business transactions were denied — to have been decided on foreseeability grounds.”
 
 Id.
 
 at 247 n. 11. As our prior discussion shows, we approach the question differently, and do not agree with the Court of Federal Claims’s holding that “the lost
 
 *872
 
 capital damages claimed by Wells were foreseeable at the time of contracting, and that there was no intervening causal step between the government’s breach and the damages claimed by Wells.” Mat 247.
 

 B. Unlike the lost profits damages, which we have concluded were too remote and uncertain, the $389,423 of High Plains’s indebtedness that Wells Fargo wrote off when it received the proceeds of High Plains’s public stock offering in satisfaction of that indebtedness was a direct result of the government’s breach of its' contractual obligation to issue the guarantee.
 

 If the government had issued the guarantee, it would have used a standard form which would have stated:
 

 “The guaranteed portion of the loan is $[18,000,000] which is [90](%) percent of loan principal____ [T]he United States of America ... will pay to: A. Any Holder 100 percent of any loss sustained by such Holder on the guaranteed portion____”
 

 7 C.F.R. § 1980.83 App. A — Form FmHA 449-34, Loan Note Guarantee (1982).
 

 The regulations governing the guarantee provided that “[t]he maximum loss covered by the Form FmHA 449-34, ‘Loan Note Guarantee,’ can never exceed ... 90 percent of the principal and interest indebtedness as evidenced by said note(s) or by assumption agreement(s).” M. § 1980.20.
 

 We read this language as providing that the government would pay 100 percent of any loss on the guaranteed portion of the loan, but not more than ninety percent of the total indebtedness. At the time of the write-off, Wells Fargo already had charged off two million dollars of High Plains’s twenty million dollar indebtedness to it. The eighteen million dollar balance was satisfied by Wells Fargo’s receiving the proceeds of High Plains’s public stock offering and writing off the remaining balance of $389,423.
 

 If the guarantee had been issued, Wells Fargo would have been entitled to recover the $389,423, because (1) the guaranteed portion of the loan (ninety percent of the twenty million dollar indebtedness) was eighteen million dollars and (2) the government agreed to pay 100 percent “of any loss sustained on the guaranteed portion” of the loan. By accepting $389,423 less than the guaranteed portion of the loan, Wells Fargo suffered a loss in that amount.
 

 Furthermore, unlike the lost profits, which were not foreseeable when the government executed the Conditional Commitment, it was foreseeable that if the government breached its obligation to issue the guarantee, the lender would suffer a loss on its loan to High Plains. Indeed, it was the likelihood of loss on this risky loan that led the lender to seek the guarantee. Wells Fargo’s loss of the $389,423 portion of its loan to High Plains was one of the contingencies against which the guarantee was intended to protect the lender.
 

 The government contends, however, that the award of $389,423 would constitute interest on interest, the payment of which an Administration regulation currently prohibits. 7 C.F.R. § 1980.11 (1996). The argument relates to the 1987 and 1989 restructuring of High Plains’s loans and Wells Fargo’s accounting treatment of payments High Plains made to it in connection therewith. As the Court of Federal Claims explained, the government “essentially argues the payments received from High Plains should have been used to reduce principal on the customer balance; thus the remaining $389,423.86 would constitute interest upon interest. However, there was no evidence presented at trial that this would have been appropriate or consistent with industry or regulatory accounting standards.”
 
 Wells Fargo Bank,
 
 N.A, 33 Fed.Cl. at 246. Indeed, the only testimony on this point was that the bank treated the $389,423 as principal.
 

 Like the Court of Federal Claims, we are “unwilling to accept the recharacterization of payments urged by the government.” M
 

 IV.
 

 Wells Fargo’s cross-appeal challenges the Court of Federal Claims’s refusal to award it damages for its alleged loss on surrendering, in the second restructuring of the High Plains loan, for $2,500,000, the options to purchase eighty-four percent of High Plains’s stock it had acquired in the first
 
 *873
 
 restructuring of that loan. Wells Fargo argues that, if the guarantee had issued, it would not then have surrendered the equity interest but instead either would have sold it for much more or retained part of it. According to its expert, it suffered a loss on surrender of its equity interest ranging from $18,277,000 to $26,264,000.
 
 Id
 

 The Court of Federal Claims rejected these damage claims because (1) they did not “meet the standards of foreseeability and certainty,” and (2) “faded to establish that the value of the equity was an
 
 interest
 
 protected by the contract. While the [Administration] might have foreseen that Wells was going to acquire an equity interest in High Plains, it does not follow that the [Administration] could have foreseen that the denial of a loan guarantee would cause a loss to debt turned into equity which was never intended to be guaranteed.”
 
 Id
 

 We agree. These damages are even more remote and conjectural than the lost profits damages that we have disallowed. Our analysis of those damages in part IIIA also requires the conclusion that the Court of Federal Claims correctly denied Wells Fargo these additional damages.
 

 CONCLUSION
 

 The judgment of the Court of Federal Claims is reversed insofar as it awarded Wells Fargo lost profits damages of $10,496,-000. It is affirmed insofar as it awarded Wells Fargo damages of $389,423 and denied Wells Fargo additional damages for the surrender of its options to acquire High Plains stock. The case is remanded to the Court of Federal Claims to enter judgment in favor of Wells Fargo for $389,423.
 

 AFFIRMED-IN-PART, REVERSED-IN-PART, AND REMANDED.